Treash, J.
On May 27, 1920, tbe city of Akron filed its petition herein to restrain the defendant, the Petér W. Connolly Company from performing its alleged contract with the city of Akron for the laying of 4.1 miles of pipe line from the storage reservoir of the city in the Cuyahoga valley to Akron, and to restrain the director of public service and the director of finance of the city from making payments upon this contract. Separate answers were filed by the Peter F. Connolly Company and the director' of public service and the director of finance of the city of Akron. The facts of the case as developed at the hearing were substantially as follows:
On May 22, 1920, Andrew J. Wilhelm, a taxpayer of said city, requested in writing the director of law of the city to bring this injunction proceeding, and in accordance with that demand the director of law began the action on behalf of the city. Mr. Wilhelm was not satisfied with the proceedings of the director of law, and through his attorneys appeared and asked leave to intervene and file an answer and cross-petition, to which all the parties to the cause objected. It was urged that this action involved not only the validity of the contract-in question, but also in principle many other contracts of the city since the enactment of the new charter, and that the taxpayers generally were vitally concerned in many of the questions to -be presented for determination in this action, and that Mr. Wilhelm was a proper and necessary party to the proceeding.
It has been repeatedly held that this form of action under Section 4314, General Code, is solely one for and on behalf of the municipality for the purpose of testing the validity of the acts of its agents and officers, and to protect the interests of the municipal corporation for the benefit of the general pub- *535 lie and not for any individual or group thereof, and only when the city solicitor or the director of law neglects or refuses to begin the action may it be maintained on behalf of the city by a taxpayer. The taxpayer is, accordingly, not a necessary, or even a proper party to such an action and the application to make Mr. Wilhelm a party was refused. Hensley v. Hamilton, 3 O. C. C., 201; 2 O. C. D., 114; Knorr, ex rel, v. Miller et al, 5 O. C. C., 609; 3 O. C. D., 297, affirmed by the Supreme Court; State v. Bowers, 4 O. C. D. (N. S.), 345; 16 O. C. D., 326, affirmed 70 Ohio St., 423.
However, it appearing to the court that counsel for Mr. Wilhelm had made careful preparation of the questions to be presented, and that one of his counsel was a former city solicitor and the other a former assistant prosecuting attorney, both able lawyers, the court invited them and upon their acceptance appointed them to act as amici curiae to sit in the trial of the case and present such arguments and briefs as they might desire.
By an ordinance of the city council passed May 13, 1918, a special election was called for the purpose of securing the approval of a $2,000,000 bond issue for the purpose of enlarging and improving the water works of the city of Akron, and at a subsequent election held August 13, 1918, this bond issue was approved by a vote of the people.
Pursuant to an advertisement by the director of public service, bids were received and opened on the 9th day of January, 1920, for constructing a 48-ineh force main either of east iron or steel pipe for a line about 4.1 miles in length. Defendant Peter F. Connolly Company furnished alternative bids as follows: first, for furnishing and laying 48-ineh lock bar pipe $681,360; and, second, for furnishing and laying a 50-inch riveted steel pipe $611, 660. Another bid by the T. R. MeShaffrey Company was, “for furnishing and laying 48-inch lock bar steel pipe for $748,000.” The city desired to use the lock bar steel pipe, and at the time of the opening of the bids a controversy arose as to the price of this pipe, which had been separately listed in the bids, it developed that ithe CoSnnolly *536 Company had only estimated the price upon this pipe, being unable to secure a definite quotation from the sole owners and manufacturers, but a few days thereafter did receive a lower quotation than had been estimated in the bid and immediately-submitted to the service director a proposal to furnish the lock bar pipe at the same -figure specified for the riveted steel pipe, namely $611,660. At about the same time the T, E. Mc-Shaffrey Company offered to furnish the same pipe-at a figure about $34 less, although their first bid was the higher, being $747,627.50. The service director finally awarded the contract to the lowest bidder under the original proposal, but at the reduced figure of $611.660. On January 19,1920, the director of public service accepted the Connolly Company’s offer, and on January 27th, entered into a contract with said company on behalf of the city for making the improvement and furnishing the pipe. On January 13, 1920, an ordinance was passed by the council to issue bonds in the sum of $685,000, for the purpose of extending, enlarging, improving, repairing, and securing a more complete enjoyment of the water works of the city of Akron, Ohio, for the purpose of supplying water to said city and the inhabitants thereof, known as ordinance No. 6529. The third section of the ordinance provides as follows:
‘ ‘ Said bonds shall be sold by the mayor and auditor or director of finance of said city and the proceeds from the sale thereof, except the premiums and accrued interest, shall be placed in the treasury to the credit of the fund for the improvement aforesaid, and shall be used for said purpose and none other; -and that the premiums and accrued interest received from the sale of said bonds shall be transferred to the trustees of the sinking fund.”
At the time of the execution of the contract with the Connolly Company, the director of public service was not given specific authority by any ordinance or resolution of council to enter into said contract, nor was there any certificate filed by the director of finance of the city showing the money in the treasury unappropriated for any other purpose, and applicable to this improvement, as required by Section 3806 of the General Code of *537 Ohio. On February 24, 1920, the city council passed a resolution known as ordinance No. 6559, determining that the action of the director of public service in letting certain contracts was proper, and approving said contracts:
“'Section 1. That whereas, the director of public service, having let contracts after competitive bidding, for the following public improvements, to-wit * * *:
“(b) .Construction of a forty-eight inch force main for the water works department, 4.1 miles from the Kent Pumping station south * * *.
“Now, therefore, it is determined by the council that said action of the director of public service was proper and was for the best interests of the city of Akron, and therefore, each of said contracts is hereby approved.”
Advertisement for the sale of the bonds was made, but no bids were secured, and on March 9, 1920, an ordinance was passed by the council repealing ordinance No. 6529 referred to, and substituting another ordinance in the same terms and conditions with the exception that the interest rate on the bonds ivas raised from five to five and one-half per cent. These bonds were subsequently sold, and the money is now in the treasury-sufficient to pay for the proposed improvement.
On the 25th day of February, 1920, J. M. Poulson, a taxpayer of the city of Akron, began an injunction suit against the city to restrain the city from proceeding with said contract with the Connolly Company. A demurrer was filed by the city to this petition, but before the demurrer was passed upon the plaintiff dismissed his petition. The Connolly Company, in their answer pleaded, and also showed at the hearing, that they had proceeded with the execution of their contract, had let subcontracts aggregating more than $300,000, and had expended large sums of money in preparation for the execution of their contract, having organized and assembled equipment and labor for such purpose, relying upon the good faith of the city in carrying out .the contract, and the dismissal of the said injunction suit. On November 5, 1918, the city of Akron adopted a charter under the provisions of the home rule amendment to the Constitution, which became effective January 1, 1920.
*538 The first question presented for determination is, was the making of this contract controlled by the statutory law relating to municipalities, or was it controlled by the charter of the city, and the acts of its council thereunder. If the charter controls then we will not need to enter into a consideration of the various defenses by way of estoppel and otherwise which are claimed by the defendants as validating this contract, unless it shall appear that the procedure is not in accord with the charter and the ordinances of the city council, or unless the state laws are made to apply by the terms of the charter itself.
We will, therefore, first consider the claim that under the Constitution of Ohio no power is vested in a municipality to make such laws different and at variance with the acts of the Legislature governing the contracting of debts, borrowing of money, levying of taxes and making of assessments. It is urged that these powers are reserved specifically to the Legislature and can be only exercised by the Legislature, and that Article 13, Section 6, of the Constitution providing as follows :
"The General Assembly shall provide for the organization of cities and incorporated villages by general laws, and restrict their -power of taxation, assessment, borrowing money, contracting debts and looming their credit, so as io prevent the abuse of such power.”
And Article 18, Section 13:
"Laws may be passed to limit the power of municipalities to levy taxes and incur debts for local purposes,” etc.,
are limitations upon the "home rule” powers of municipalities as contained in Article 18, Section 3:
“Municipalities shall have authority to exercise all powers of local self-government,” etc.,
and Section 7:
"Any municipality may frame and adopt or amend a charter for its government and may, subject to the provisions of Section 3 of this article, exercise thereunder all powers of local self-government,”
*539 and it is contended that the Constitutional provisions reserving to the Legislature the power to “restrict” and “limit” the city’s powers to “levy taxes,” “borrowing money” and “contracting debts,” reserves to the Legislature sole power to determine the manner and method of making contraets for public improvements, and this applies to charter cities as well as to other cities.
The case of State, ex rel, v. Cooper, 97 Ohio St., page 96, wherein the Supreme Court held that the Smith one-percent, law was a law limiting taxation, within the meaning of the Constitution, and that the city of Toledo must subject itself to its limitations and the supervision of the county budget commission, is urged as sustaining this contention. The Smith one-percent. law is clearly an act “limiting” and “restricting” taxation, but by what process of definition, construction or interpretation could the word “limit” or “restrict” be applied to the statutes providing the manner and means of making municipal improvements and contracting debts. On the contrary, these various statutes provide how debts may be contracted, money borrowed, and taxes and assessments levied. There is no attempt to “limit” or “restrict” debts and taxation in any of the acts specifying the various steps that must be taken by tbe council in its legislative procedure. Their only purpose is to show “how” it can be done, and to give certainty, definiteness, regularity and uniformity to the proceedings throughout the state. This procedure was a question of expediency and regulation properly within the discretion of the Legislature which derived its power and authority from the Constitution. But since the home rule amendment to the Constitution all powers of local self-government are vested in the municipalities where they choose to adopt charters claiming such powers, and when a charter has been so duly adopted, a municipality derives its power, not from the Legislative enactments, but from the Constitution, and the council of that municipality becomes a law-making body of the municipality within its scope and authority, even as the Legislature does for the state.
Johnson, J., rendering the opinion in Billing v. Railway Company, 92 Ohio St., at page 482, et seq., scuys:
*540 “Under the Constitution, previous to the amendment in 1912, municipal corporations in their public capacity possessed such powers, and such only, as were expressly granted by statute and such as might be implied as essential to carry into effect those powers which were expressly granted, Ravenna v. Pennsylvania Company, 45 Ohio St., 118.”
“The manifest purpose of the amendment in 1912 was to alter this situation and to add to the governmental status of the municipalities. The people made a new distribution of governmental power. The charter of the city which has been adopted in conformity with the provisions of Article 18, and which does not disregard the limitations imposed in that article or other provisions of the Constitution finds its validity and its vitality in the Constitution itself and not in the enactments of the General Assembly. The source of authority and the measure of its extent is the constitution. The powers conferred by such a charter, adopted within the limitations stated, are not affected by the general statutes of the state.”
Interpreting the charter of the city of Cleveland, he further said:
“Section 7 confers on the municipality authority to adopt a charter ‘for its government’ and ‘to exercise thereunder all powers of local self-government.’ As to the phrase ’all powers of local self-government’ it is said in the Lynch case, supra-. ‘ They are such powers of government as, in view of their nature and the field of their operation, are local and municipal in character.’ And in Fitzgerald et al v. City of Cleveland, 88 Ohio St., 338, 344, it is said: ‘ It is sufficient to say here that the powers referred to are clearly such as involve the exercise of the functions of government, and they are local in the sense that they relate to the municipal affairs of the particular municipality. ’
“Any provision in a charter attempting to confer powers upon a municipal government in .excess of the powers permitted to be granted by the constitution, or disregarding in any way the limitations imposed by that instrument, would be invalid. But it does not follow from this that a city may not by its charter confer on its government powers which are different from those conferred by general laws upon the municipal governments of the state generally.
“It was contemplated by the framers of the amendment to the Constitution that the provisions in a charter, adopted by a *541 city, would differ from the general laws of the state, within the limits defined by the Constitution. The object of the amendment was to permit such differences .and to make them effective. ’ ’
The making, installation and maintenance of water works for the supplying of its ^citizens with water is purely a matter of local concern, and has always been recognized, like other public improvements, as a matter of municipal concern, and it can not be presumed that the framers of the home rule amendment to the Constitution, nor the people in endorsing it, contemplated that the very vital matter of making such improvements and the manner and form of procedure in legislating for the improvement, letting the contract, and designating the officials who shall execute it and enforce it, should be left to the Legislature of the state. As is said by Johnson, J., 92 Ohio St., 486:
“It is well settled that a body adopting amendments, such as are here involved, will be presumed to have had in mind the legal status of and the course of legislation and existing statutes touching the subjects dealt with.
“A consideration of the course of legislation in Ohio under the old Constitution seems to clearly disclose that the control of streets has been regarded as a matter chiefly of municipal concern, the control to be exercised under such regulations as the Legislature prescribed. It being, as shown, the source of municipal authority.”
The same reasoning as applied by the Supreme Court in regard to the control of streets and the letting of municipal franchises applies even with greater force to the making of public improvements for water works, and were the power of contracting debts, 'borrowing1 money, levying taxes and assessments to be withdrawn from the local government, home rule would be but an empty phrase and limited to a mere form of government.
The Supreme Court in the ease of Fitzgerald v. Cleveland, 88 Ohio St., 443, has .definitely determined that no such limited construction can be placed upon the home rule amendment:
“It is contended by plaintiffs in error that the office of the. charter, referred to in Section 7, is merely to provide a form of' *542 government and not to prescribe any of its functions. When considered in connection with Section 3 and the rest of the provisions of Article 18, and in the light of the manifest objects sought to be attained by their adoption, we think there is no warrant for giving this limited meaning to the language.”
Again, in the case of State, ex rel Bailey, v. George, 92 Ohio St., 344, second paragraph of the syllabus:
“Statutes passed in pursuance of such home rule amendment should be liberally construed so as to effect the plain purpose of such amendment.”
The charter of the city of Akron grants to the city ample authority for the construction and maintenance of public improvements.
“Section 1. The inhabitants of the city of Akron, * * * may create, provide for, construct, regulate and maintain all things of the nature of public works and improvements # * #.
“Section 2. The enumeration of particular powers by this charter shall not be held or deemed to be exclusive, but, in addition to the powers enumerated herein, implied thereby or appropriate to the exercise thereof, the city shall have and may exercise all other powers which, under the Constitution and laws of Ohio, it would be competent for this charter specifically to enumerate.”
It must, therefore, follow that the validity of the contract in question must be determined by the law of the charter and the legislative and administrative steps taken thereunder to authorize it.
But it is claimed that the charter itself has provided no specific method for letting contracts and making public improvements, but, on the other hand, it is specifically provided that the procedure shall be that enacted by the state- law.
Section 1 is as follows:
The ,c^y shall have all powers that now are, or hereafter may be granted to municipalities by the Constitution or laws of Ohio ; and all powers, whether express or implied, shall be exercised and enforced in the manner prescribed by this charter, or when not prescribed herein, in such manner as. shall *543 be provided by ordinance or resolution of the council, and when not prescribed by this charter or amendments thereto, or ordinance of council, then said powers shall be exercised in the manner prescribed by the state law.”
'Section 129 is as follows:
■ “Public improvements of all kinds may be made by the appropriate departments either by direct employment of the necessary labor and the purchase of the necessary supplies and materials, with separate accounting as to each improvement so made, or by contract duly let after competitive bidding, as the council may determine.”
Were these all of the provisions of the charter on the subject of powers and improvements, there might be some force to the argument of the amici curiae, but there are other sections bearing upon the subject, which, by the primary laws of construction of any instrument must be looked to to determine the intent.
Section 27 of the charter is as follows:
“There is hereby created a council which shall have full power and authority, except as otherwise herein provided, to exercise all the powers which now are or may be hereafter conferred upon municipalities by the Constitution of Ohio, and all the powers conferred upon the city of Akron by the charter, and any additional powers which have been or may be conferred upon municipalities by the General Assembly.”
Section 36 is as follows:
“No money shall be drawn from the treasury of the city, nor shall any obligation for the expenditure of money be incurred except pursuant to appropriations made by the council; and whenever an appropriation is so made, the clerk shall forthwith give notice to the director of finance. Moneys appropriated as hereinbefore provided shall not be used for other purposes than those designated in the appropriation ordinances, without authority from the council.”
Section 131 provides:
“All contracts entered into by the city or for its benefit prior to the taking effect of this charter shall continue in full *544 force and effect. All public work begun prior to the taking effect of this charter shall be continued and perfected hereunder. Public improvements for which legislative steps shall have been taken under laws in force at the time this charter takes effect may be carried to completion in accordance with the provisions of such laws.”
. The only legislative step claimed to have been taken prior to the going into effect of the charter was the bond resolution of May 13, 1918, providing for a special election to authorize the issue of $2,000,000 in water works bonds. This, however, can not be considered as a “public improvement for which legislative steps shall have been taken under laws in force at the time this charter takes effect,” for there are no legislative enactments in the making of this improvement required by the statute, and while these bonds may be considered as a part of the $2,000,000 issue, still there is no legislative connection necessarily between the two, and therefore none of the legislative steps for this improvement were taken prior to January 1, 1920. Furthermore, this section is permissive and not mandatory, and does not require such public improvements to be carried to completion in accordance with the provisions of the state law.
Having determined that the city, under the Constitution and its charter, not only has “power” to determine the manner and means for making contracts for its local improvements, but that this improvement in question is one coming within the jurisdiction of the city under its charter, the question now arises, does the charter make any provision in regard to the award of contracts? We are of the opinion that it does, and that these steps have been substantially complied until.
The only legislative requirement under the charter for the making of a contract is that contained in Section 36, as follows:
“No money shall be drawn from the treasury of the city, nor shall any obligation for the expenditure of money be incurred except pursuant to the appropriations made by the council; and whenever an appropriation is so made the clerk shall forthwith give notice to the director, of finance. Moneys appropriated as hereinbefore provided, shall not be used for other purposes than those designated in the appropriation ordinance, without authority from the council.
*545 On January 13, 1920, the council did make an appropriation for this purpose by passing ordinance No. 6529, and provided therein for the issuance and sale of bonds in the sum of $685,000 and that the “proceeds should be placed in the treasury to the credit of .the fund for the improvement aforesaid, and should be used for said purpose and no other. ’ ’
In pursuance of this bond and appropriation ordinance, the contract was let on January 27, 1920.
It is true that this ordinance was subsequently repealed after the execution of the contract, and a new ordinance in the same terms and conditions passed providing a rate of five and one-half instead of five per cent, interest on the bonds. While in the form of a repeal, this ordinance was in substance and in truth an amending ordinance, and should properly have been so labeled. The court will look not to the technical form, but to the substance, in interpreting such legislation, and must give effect to the real purpose and intention to be accomplished, which was namely, the raising of the rate of interest on the bonds that they might be sold, since no bids had been received at the five per cent., rate.
On February 24, 1920, the council passed a resolution specifically referring to this contract and approving and confirming it. Prior to that time there had been no ordinance or resolution passed by council determining the method for the awarding of contracts for public improvements. No money had been drawn from the city treasury, nor had any obligation for the expenditure of money been incurred prior to the bond and appropriation ordinance of the council, and it, therefore, follows that the provisions of the charter in this regard had not been violated.
It is urged, however, that the portion of section 36 providing that “whenever an appropriation is so made, the clerk shall forthwith give notice to the director of finance,” was a condition precedent to the execution of the contract. -There are no terms nor language to this effect, and the provision is evidently directory only, intended to advise the director of finance of the appropriation ordinance, ^and of his authority to make pay *546 ments thereon. It does not provide that the failure of the clerk to give such notice shall make the contract void or affect in any way its validity. At most no payment upon the contract could be enforced until such certificate had been issued to the director of finance, but that is a matter not in issue here.
It is further claimed that, granting the sufficiency of the legislation of council, that the contract was not awarded in compliance, with the provisions- of the charter.
Section 129 of the charter provides two ways in which public improvements may be made by the appropriate departments, either by the direct employment of the necessary labor and the purchase of the necessary material, or by contract, as the council may determine.
Section 65 of the charter provides that “the director of public service shall manage -and supervise all public improvements,” and “manage and control the water supply system and maintenance and operation of the same. The director of public service was, accordingly, the proper officer to make this improvement, and he chose the second method of doing it by contract and advertised for bids, which were received and opened in' the manner heretofore indicated. There is no requirement as provided in Sections 3806 and 4328 of the General Code that the money must be in the treasury to the credit of the fund, etc., and that the contract shall be awarded to the lowest and best bidder, but the only provision is that the work may be done by contract duly let after competitive bidding, as the council may determine-. The Connolly Company was the lowest bidder when the bids were originally opened, and subsequently voluntarily reduced their bid nearly seventy thousand dollars. After that, the other bidder made a slightly greater reduction, which, however, involved no material financial difference, and the director of public service awarded the contract to the Connolly company.
There has-been-^o claim made of fraud or lack of good faith on the part of the service-director of the city of Akron, Con-molly Company, or any .other parties connected with the transaction. It was properly a matter'vi?iíhm the discretion of the *547 service director, and. he was bound by no law providing that the contract must be let to the lowest and best bidder. He is presumed to have taken into consideration all of the factors and elements connected with the transaction, and within his discretion, his decision can not be questioned, except for fraud.
But it is urged that the council did not determine which of the two methods should be used in making the improvment, and that, therefore, the director of public service was without authority to receive bids or let the contract. It is true that no general method of procedure had been provided by an ordinance of council, and that no method of determining which course should be followed by the service director was taken in making this improvement, except the resolution of February 24, confirming and approving the proceedings of the director of public service. It will be noted that there is no provision of the charter requiring a uniform and general method being devised by the council for awarding contracts, nor does the charter provide that any such method shall be determined in advance of receiving bids, as provided by statutory enactments, but since the council is sovereign within the power entrusted to it, and there are no limitations in the charter as to when it .shall exercise its power, there is no good reason why it can not exercise its judgment and discretion by passing the necessary legislation approving and confirming the acts of the city officials, done within the scope of their authority, after as well as before these acts are performed.
It is finally urged by the amici curiae that the framers of the charter never intended to confer such unbridled authority upon the director of public service and the council as this, and thus open the way without let or hindrance to fa.vn-rit.isrn, extravagance and corruption. We can best judge of the motives and intent of the framers of the charter by what they actually did, and since they clearly gave such unbridled and autocratic authority to the director of public service and the council, it is not within the province- of a court to correct their mistakes, if they were made. It is only the function of the coiirt to interpret and declare the law as it is made by the people or *548 the legislative power. The question of the wisdom or expediency of such a procedure for letting contracts as is devised in the Akron charter, is one which is within the power of the council and the people of the city of Akron to correct at any time, if they see fit, and if fraud and corruption come, the fault must rest upon those who originated and made it possible, but it is neither necessary nor becoming to this court to pass upon that matter.
The petition of the plaintiff is, accordingly, dismissed, at its costs.